# In the United States Court of Federal Claims

### No. 16-784C
### Filed: August 22, 2016
### Redacted Version Issued for Publication: August 26, 2016[1]

```
* * * * * * * * * * * * *   *
PALANTIR TECHNOLOGIES INC.       *
and PALANTIR USG, INC.,          *
                                 *     Pre-Award Bid Protest; Motion to
        Protestors,              *     Dismiss; Lack of Subject Matter
    v.                           *     Jurisdiction; Standing; Waiver.
                                 *
UNITED STATES,                   *
                                 *
        Defendant.               *
                                 *
* * * * * * * * * * * * *   *
```

**Hamish Hume**, Boies, Schiller & Flexner LLP, Washington, D.C., for protestors. With him were **Stacey K. Grigsby**, and **Jon R. Knight**, Boies, Schiller & Flexner LLP, Washington, D.C.

**Domenique G. Kirchner**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Scott A. MacGriff**, Trial Attorney, Commercial Litigation Branch, **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Scott N. Flesch**, **Major Lawrence P. Gilbert**, **Evan C. Williams**, and **Frank A. March**, United States Army Legal Services Agency, and **Debra J. Talley** and **Daniel J. Beuke**, United States Army Material Command.

## O P I N I O N

### HORN, J.

In this court, protestors, Palantir Technologies Inc. (Palantir Technologies) and Palantir USG, Inc., (Palantir USG) filed a pre-award bid protest on June 27, 2016, challenging the Department of the Army, Army Contracting Command, Aberdeen Proving Group's (the agency) Request for Proposals No. W56KGY-16-R-0001 (the solicitation).

---

[1] This opinion was issued under seal on August 22, 2016. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

Protestor Palantir Technologies "is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California," and "is the holder of the Palantir GSA schedule and many of Palantir's government contracts." Protestor Palantir USG "is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Palo Alto, California." Protestors note that Palantir Technologies "owns one hundred percent of the stock of PUSG [Palantir USG]." Protestors filed suit in this court after the Government Accountability Office (GAO) denied Palantir USG's GAO protest. See, generally, Palantir USG, Inc., B-412746, 2016 WL 3035029 (Comp. Gen. May 18, 2016).

As indicated at the GAO, "[t]he solicitation seeks a single contractor to be the system data architect, developer, and integrator of DCGS–A2 [Army's Distributed Common Ground System-Army Increment 2], which is the second increment of the DCGS–A. DCGS–A is the Army's primary system for the processing and dissemination of multi-sensor intelligence and weather information to the warfighter." Id. at *1.

Protestors believe the Army was arbitrary and capricious to offer the solicitation as issued because protestors contend "Palantir[2] has developed a technology that solves the needs of DCGS." Protestors claim that the data management platform that protestors have to offer, also called the Palantir Gotham Platform, was "initially developed between 2004 and 2009 with the help of an investment from [sic], and a  partnership with, the venture capital arm of the Central Intelligence Agency," and since "2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ('SOCOM'), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies)." Protestors argue that, as written, "[t]he Solicitation for DCGS-A2 makes it impossible for Palantir to offer its Data Management Platform as a commercial or nondevelopmental item to satisfy the Army's requirements."

**FINDINGS OF FACT**

The Army has explained that:

> DCGS-A is a program to combine all intelligence software/hardware capabilities within the Army into one program with the ability to access and be accessed by, not only Army intelligence and command components, but also the other members of the DCGS enterprise. It is composed of many software products, commercial, government, and open source, as well as software integration that allows all the different products and components to communicate and operate seamlessly.

---

[2] In their filings with the court, without distinguishing, protestors use the term "Palantir" to refer to Palantir Technologies and Palantir USG collectively. Defendant, typically, uses the term "Palantir" to refer only to Palantir USG. In this opinion, the court refers to each entity by name unless quoting directly from the parties.

The Performance Work Statement for the solicitation at issue noted that "DCGS-A is the Army's primary system for processing and dissemination of multi-sensor intelligence and weather information to the Warfighter. It is deployed worldwide in support of intelligence operations, including all Theaters of Operation.  DCGS-A must remain interoperable and compatible with the Joint Command System infrastructure and mission applications."[3] The Performance Work Statement also noted that the requirements of DCGS-A2 included the "development of new data architecture, standards based enhanced visualization and analytical tools, cloud computing and 'big data' analytic capabilities; cyber analytics and data integration, visualization capabilities, Cyber Operations, Interoperability, Counter Intelligence/Human Intelligence (HUMINT), Signals Intelligence (SIGINT), Weather, Geospatial Intelligence (GEOINT) and Sensor Management," and that "[t]hese efforts include Software Development, Capability Enhancements, Integration, Limited Fielding and Training support, Maintenance, and Support for logistics development, for a period of performance of six years from contract award."

On August 13, 2014, the Army issued a Request for Information, which was "conducted to assess the level of relevant competition and capabilities in the market place and elicit industry feedback to assist the Program Office in developing the Acquisition Plan,"[4] and "request[ed] respondents' corporate overview information and basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program." The August 13, 2014 Request for Information indicated that the "[p]roposed contract types under consideration for this effort are cost-plus-incentive fee (CPIF) or cost-plus-fixed-fee (CPFF), with an estimated value of $80-$100M for development efforts over three to four years."[5] Regarding the August 13, 2014 Request for Information, the Army indicated that the "[v]ast majority of respondents support hiring a contractor as the Lead Systems Integrator (LSI) due to efficiencies in industry decision making and resource-marshaling processes." Palantir USG responded[6]

---

[3] In the agency's December 16, 2015 recommendation for issuance of the solicitation, Ms. Heidi Shyu, the then-Assistant Secretary of Defense (Acquisition), stated that DCGS-A Increment 1 was "fully operational," but its "data architecture is over 10 years old and is based upon technology that is nearing obsolescence, with no growth margin." In the complaint, protestors allege that "[f]or over 15 years, the Army has spent approximately $6 billion trying to develop its own software solutions for DCGS through developmental service contracts with myriad defense contractors."

[4] Protestors state that the August 13, 2014 Request for Information "failed to inquire about the availability of commercial or nondevelopmental items that could meet the requirements of DCGS-A2."

[5] Protestors believe this statement demonstrates that "[t]he Army conceded in the first RFI [Request for Information] that it was not even contemplating the possibility of a fixed-price contract for the procurement of commercial items."

[6] Palantir Technologies did not respond to the August 13, 2014 Request for Information.

to the August 13, 2014 Request for Information and stated: "The Government does not need to *build* Increment 2 functionality; the Government can buy the core functionality from the commercial market and integrate any number of additional applications." (emphasis in original). Palantir USG further suggested that the Army issue a fixed-price contract for any solicitation in the future.

On December 5, 2014, the Army issued a second Request for Information, which "was issued to determine ability of individual companies to act as the prime contractor for the DCGS-A development effort." As in the first Request for Information, the second Request for Information "request[ed] respondents' specific answers regarding the basic qualifications in managing software development projects that are similar in scope and process to the DCGS-A program." Palantir USG again responded,[7] to try to explain the value of the commercial approach:

We continue to believe that the success of Increment 2 requires a proven commercial solution to ensure the delivery of a working capability on time and within budget. We are concerned that the present RFI, DCGS-A_INC2_RFI2, is focused on collecting information on each respondent's capability to conduct a services-based, large-scale, and custom software engineering effort. Several questions are designed to assess vendor experience with major software development projects, rather than to assess existing software capabilities applicable to Increment 1 capability gaps.

Palantir USG also recommended "that the Government pursue a different acquisition strategy than the long-term development used in Increment 1. We believe the acquisition

---

[7] Defendant argues that although "Palantir USG responded to RFI No.2," "Palantir USG declined to answer question 3.0(f) in RFI No.2," and "Palantir USG declined to answer question 3.0(h) in Request for Information No.2." Question 3.0(f) asked: "Does your company have an adequate DCAA accounting system? If not, can your company obtain an adequate DCAA accounting system prior to proposal submission?" Question 3.0(h) asked, "[w]hat is your company's current rate of personnel retention over the last five (5) years?" Defendant also alleges that Palantir USG did not "complete the Army's chart and identify its specific capabilities across the various DCGS-A," as well as claims that Palantir USG "declined to answer question 3.0(d) in RFI No.2," which asked: "Within the last three (3) years, from the table below, please indicate which domains that your company has experience developing and integrating with these types of software applications/capabilities." Protestors respond that:

That is not what the Army requested. Rather, it asked prospective bidders for which "Agency or Gov't Customer"—including procurement "contract number"—they had certain experience within "the last three (3) years." Palantir had *already provided* the Army with information about its prior Government contracts. There was no reason to do so again.

(emphasis in original; internal citations omitted).

of an open architecture, COTS-based platform at a Firm-Fixed Price (FFP) offers the most cost-effective and lowest-risk procurement approach for Increment 2 capabilities."

On May 6, 2015, the Army issued a third Request for Information, which "[w]as released to determine if rule of two exists, as defined in FAR [Federal Acquisition Register] 19.502, and if a small business set-aside is appropriate for Increment 2 development." As with the previous Requests for Information, Palantir USG indicated that it was not a small business and further responded:

> The initial decision to embark on a significant software development effort, rather than acquiring a COTS solution, resulted in many of the DCGS-A Increment 1 challenges. We are concerned that several of the RFI questions indicate that the Government is considering contract terms and vehicles that would perpetuate risky long-term, services-based contracts that focus on large software development activities.

Palantir USG also indicated in its response:[8]

> Data integration requirements are not unique to the Army. The Army can acquire an enterprise-wide data platform now, without development risk or cost, and focus custom development efforts on unique needs across the Force. The successful delivery of Increment 2 depends on the answer to a central question: will the Army acquire a data platform from the commercial market or will it attempt to build one itself?

In July 2015, the Army issued a Market Research Report, which determined that "the DCGS-A Increment 2 development effort cannot be procured as a commercial product."[9] The Market Research Report stated that "[s]ignificant portions of the anticipated Increment 2 scope of work such as Data Fusion, Intelligence Support to Cyber, and DIB [Integrated Backbone] upgrade are not available as a commercial

---

[8] In responding to the question in the May 6, 2015 Request for Information, "[e]xplain how your company would be able to operate without payment for up to 90 days if awarded a Prime Contract for Increment Two Development," Palantir USG indicated:

> As a privately owned company, Palantir Technologies, the parent company of Palantir USG, Inc., does not typically release financial information. We will provide audited statements as reasonably necessary for the purposes of determining our ability to perform our obligations under the agreement subject to the appropriate confidentiality provisions being put in place

[9] A chart included in the Market Research Report briefly summarized the role of each of the Requests for Information.  The Market Research Report indicated "**RFI 1** To determine level of competition and industry feedback of Acquisition Strategy[,] **RFI 2** To determine capability of individual businesses to perform as prime contractor[,] **RFI 3** Inform Increment 2 on the role of small business[.]" (emphasis in original).

product. As such, the DCGSA Increment 2 development effort cannot be procured as a commercial product."

After the issuance of the Requests for Information and Market Research Report, on December 23, 2015, the Army issued Request for Proposals No. W56KGY-16-R-0001, for engineering, manufacturing, and development services and, as noted above, required a single contractor to be the system data architect, developer, and integrator for DCGS-A2. The solicitation contemplated the award, on a best value basis, of a single indefinite-delivery, indefinite-quantity contract, with the simultaneous issuance of a cost-reimbursement type task order. The period of performance contemplated a six year term from contract award.

The solicitation had four evaluation factors: (1) Technical; (2) Cost/Price, (3) Past Performance, and (4) Small Business Participation Plan. The Technical factor included the five sub-factors: (1) Data Architecture, (2) Fusion Data Analytics, (3) Interoperability, (4) Visualization Framework/Usability, and (5) Data Rights. The solicitation also instructed that "[t]he Offeror shall complete and submit the PWS [Performance Work Statement] Compliance matrix located in section J of the RFP [solicitation]."

The solicitation's evaluation approach stated that regarding the basis for award:

Initially, there will be a DCGS-A Increment 2 software capability demonstration by the offeror evaluated on a acceptable/unacceptable basis. Only those offerors who successfully complete the demonstration will be further evaluated and considered for award. The award will be made based on the best overall (i.e., best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to the evaluation factors: Technical, Past Performance, Cost/Price, and Small Business Participation Plan. The Technical factor is significantly more important than Cost/Price. Past Performance and the Small Business Participation Factors will be rated on an acceptable/unacceptable basis. A rating of acceptable or neutral must be achieved for the Past Performance Factor. A rating of acceptable must be achieved for the Small Business Participation Factor in order to be eligible for award. Offerors are cautioned that the award may not necessarily be made to the highest technically rated or lowest cost or price offer.

The closing date for the solicitation was February 16, 2016. That same day, February 16, 2016, but prior to the closing of the solicitation, Palantir USG filed a timely protest at the GAO. The GAO subsequently issued its decision on May 18, 2016 denying the protest. See, generally, Palantir USG, Inc., 2016 WL 3035029. In a short decision, the GAO indicated that "[w]hile the market research revealed that commercial items were available to meet some of the DCGS–A2 requirements, the agency concluded that there was no commercial solution that could meet all the requirements of DCGS–A2," and "[b]ecause the agency concluded that significant portions of the anticipated DCSG–A2 [sic] scope of work were not available as a commercial product, the agency determined

that the DCGS–A2 development effort could not be procured as a commercial product under FAR part 12 procedures," and, that, therefore, "[t]he protester has failed to show that the agency's determination in this regard was unreasonable." Id. at *3 (footnote omitted). The GAO also determined "the record shows that the agency reasonably decided on its approach of having a single contractor, who would be responsible for selecting all the components of DCGS–A2, and who would bear the responsibility for making certain that those components are integrated, in contrast to the phased approach favored by Palantir." Id. at *4. The GAO concluded:

> [T]he agency's approach is reasonably related to its need for a fully integrated and interoperable system made up of a number of specific capabilities, some of which are commercially available and some of which are not. While the agency considered several potential approaches to this procurement, including the phased approach favored by the protester, the agency ultimately concluded that it would have a greater likelihood of success (in that it could avoid certain technical risks, concerns and significant schedule risk and cost uncertainty) by opting to have a single contractor serve as the system integrator in charge of developing and selecting the components and making sure that they can be successfully integrated. As such, we have no reason to question the approach chosen by the agency or to conclude that the solicitation is unduly restrictive of competition.

Id. at *5 (internal citation omitted).

Forty-three days after the GAO decision was issued, on June 30, 2016, protestors filed the current bid protest in this court. Protestors' complaint had seven counts: In count one, protestors allege that the Army violated 10 U.S.C. § 2377 (2012) and 48 C.F.R §§ 10.002 and 11.002 (2016) by refusing to solicit the Data Management Platform as a commercial item. Similarly, in count two, protestors state that the Army violated 10 U.S.C. § 2377 and 48 C.F.R §§ 10.002 and 11.002 by refusing to solicit a commercial item for the entirety of DCGS-A2, and, in count three, that the Army violated 10 U.S.C. § 2377(c) by failing to determine whether its needs could be met by commercial items. Count four contends that the Army violated 48 C.F.R. § 16.301-2(a) (2016) by soliciting a cost-plus contract instead of a fixed price contract, and posits that:

> Given the Army's experience of 15 years with DCGS-A1, and given the existence of commercial items for which pricing information is available, the Army cannot credibly claim that it is unable 'to define its requirements sufficiently to allow for a fixed-price contract' or that it is not possible for "costs to be estimated sufficient with accuracy to use any type of fixed-price contract."

Count five alleges that the Army violated 10 U.S.C. § 2304a(f) (2012) and DFARS Part 217.204 (2016) by soliciting a task order contract with a base period of six years, and count six alleges that the Army violated 48 C.F.R. § 16.504 (2016) by soliciting an

impermissibly expensive task order exceeding $112.0 million. Finally, in count seven, protestors claim that "the Army engaged in arbitrary, capricious, and unlawful conduct by refusing to allow Palantir to bid, by resisting innovation, by insisting on the failed approach of DCGS-A1, and by engaging in bad faith conduct."

> Protestors allege that
>
> the Army's conduct is fundamentally irrational, arbitrary, and capricious because it insists upon constructing a Solicitation for DCGS-A2 that repeats all the failures of DCGS-A1. It insists on a cost-plus development effort even though that effort was a complete failure for DCGS-A2 [sic]. It insists on larding up its list of requirements with meaningless or redundant work streams that are nothing more than an incentive for the defense contractors involved to make money, and will have little to no operational utility. It insists on requiring DCGS-A2 to have interoperability with antiquated systems created over a decade ago, and that are now obsolete. It is possible for Palantir to do all these things, but it is irrational and costly for the Army to insist upon them. Requiring the contractors to perform such useless tasks is arbitrary and capricious.

Protestors ask this court to enter

> a permanent injunction requiring the Army to rescind its Solicitation and to take any and all necessary corrective action needed to remedy its legal violations, including at a minimum through the issuance of a revised solicitation that complies with the Army's legal obligations to define its requirements in such a manner that solicits bids from offerors who will provide commercial items or nondevelopmental items to meet the Army's requirements. . . .

Initially, in response to the complaint, defendant filed a motion to dismiss protestors' complaint.[10] Defendant argues that protestors lack standing to bring this protest and that even if protestors have standing, they have waived any objections to the solicitation.

## DISCUSSION

As a threshold matter, the court addresses defendant's motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) (2016). Defendant alleges that this court does not have subject matter

---

[10] The parties have briefed the defendant's motion to dismiss for lack of subject matter jurisdiction and the court held oral argument on defendant's motion to dismiss. In addition, after multiple hearings with the parties on issues related to supplementation of the Administrative Record and possible discovery, the court granted, in part, protestors' motion to supplement the Administrative Record, and permitted limited discovery. This opinion only addresses the defendant's motion to dismiss.

jurisdiction to decide protestors' bid protest in the above-captioned case because protestors do not have standing, because neither Palantir USG or Palantir Technologies are interested parties, or alternatively, that protestors have waived any potential challenge to the solicitation by not filing a protest in the United States Court of Federal Claims prior to the close of the time to submit proposals. Although protestors argue both Palantir Technologies and Palantir USG, together and separately, are interested parties and meet the standing requirements for a pre-award bid protest, the court considers each entity separately.

Regarding Palantir USG, defendant argues that the court should dismiss Palantir USG because Palantir USG "cannot demonstrate that it is a 'prospective bidder.' Palantir USG also cannot demonstrate that it possesses the requisite 'economic interest' to establish standing. Palantir USG also cannot demonstrate that it comes within the limited exception recognized in *CGI Federal, Inc. v. United States,* 779 F.3d 1346 (Fed. Cir. 2015)." It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481,

1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2012) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996, codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1) (2012). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1317 (Fed. Cir. 2007); see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v.

United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In the context of a pre-award bid protest, the United States Court of Appeals for the Federal Circuit has determined that to show the requisite "direct economic interest," and, therefore, to be an "interested party" under the Tucker Act, the protestor has to have suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a pre-award protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. at 647; Miles Constr., LLC v. United States, 108 Fed. Cl. at 797. This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of some prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

As explained by the United States Court of Federal Claims in Digitalis Education Solutions, Inc. v. United States:

> Only an "interested party" has standing to challenge a contract award. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. Id. Thus, a party must show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest. "[I]n order to be eligible to protest, one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation." MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989). To prove a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. Rex Serv., 448 F.3d at 1308.

Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (extending the rule requiring the submission of an offer to a sole-source procurement). The Federal Circuit in Digitalis further explained that "in order to be an actual or prospective bidder, a party must submit a statement of capability during the prescribed

period." Id.[11]  Even within this framework, the Federal Circuit has held that it is possible to be a prospective bidder if a protestor had not submitted a proposal to the agency. See CGI Fed. Inc. v. United States, 779 F.3d at 1348.

In CGI, the United States Department of Health and Human Service's Centers for Medicare and Medicaid Services issued requests for quotes in order to issue contracts that would use the awardees to determine if Medicare claims had been correctly paid. See id. at 1347. The Federal Circuit indicated if the contractor identified an overpayment, the agency would send a demand letter to the provider and repayment, and then pay the contractor a contingency fee.  See id. In CGI, CGI protested the payment terms of the requests for quotes, contending that the terms violated certain statutory and regulatory provisions. See id. As noted by the Federal Circuit:

> Five different contractors bid on the 2014 RFQs, but CGI did not. Instead, before bidding closed, CGI filed a timely pre-award protest at the Government Accountability Office ("GAO") challenging the revised payment terms. While the GAO protest was pending, the bidding period closed. The GAO subsequently denied the protest. Three business days later, CGI filed a protest in the United States Court of Federal Claims.

Id. at 1348. The Federal Circuit recognized that "CGI never submitted a bid in response to the 2014 RFQs and thus is not an actual bidder. CGI must therefore show that it was a prospective bidder at the time it filed its protest in the Court of Federal Claims. We hold that it has made such a showing." Id. As explained by the Federal Circuit:

> CGI was a prospective bidder when it promptly initiated and diligently pressed its protest in the GAO forum, which Congress has encouraged protestors to use before suing in court. Unsuccessful in the GAO, it immediately filed for relief in court. We do not think that Congress meant for a protestor in CGI's position to lose its entitlement to sue just because delays engendered by the GAO adjudicatory process pushed completion past the closing date for bid submissions. Concluding, as we do, that CGI filed a protest prior to the close of bidding and thereby established its prospective bidder status, and that CGI thereafter diligently pursued its rights, CGI has prospective bidder status to pursue its Court of Federal Claims protest.

Id. at 1351.  Furthermore, the Federal Circuit concluded that "CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was continuously pursuing its challenge to the payment terms in the 2014 RFQs." Id. at 1349-50 (footnote omitted).

---

[11] Stating the obvious, the Federal Circuit has indicated that in order to be an actual bidder, a protestor needs to submit a bid. See CGI Fed. Inc. v. United States, 779 F.3d at 1348.

Palantir USG's position is best compared to that of the protestor in CGI. Like Palantir USG in the above captioned protest, the protestor in CGI did not submit a proposal in response to the solicitation. Likewise, the CGI protestor filed a GAO protest prior to the close of bidding to establish prospective bidder status, even though the timeframe for submitting a proposal lapsed after the GAO protest was filed.  As in CGI, Palantir USG subsequently filed suit in this court after receiving a negative decision at the GAO, but before the agency had made an award pursuant to the solicitation. Therefore, like the protestor in CGI, who "filed pre-award bid protests at the GAO, claiming that, contrary to FAR Part 12, the payment terms were inconsistent with customary commercial practice, unduly restrictive of competition, and violated the recovery audit program's enabling statute as well as prompt payment requirements," CGI Fed. Inc. v. United States, 118 Fed. Cl. 337, 346 (2014), rev'd, 779 F.3d 1346 (Fed. Cir. 2015),[12] before this court, Palantir USG, likewise, is seeking to challenge the validity of the solicitation, not evaluations of the offers received, charging that the agency has violated statutory provisions, most notably 10 U.S.C. § 2377.

The court notes that defendant disagrees that CGI is the proper comparison to this protest.  Defendant notes that in the quotation above, the Federal Circuit specifically used the phrases, "diligently and continuously" and "immediately" filing suit in the United States Court of Federal Claims, and argues it was these facts that created an exception to the typical rules (citing CGI Fed. Inc. v. United States, 779 F.3d at 1351). Defendant argues, therefore, "a gap of three business days between the GAO denial and the COFC [the United States Court of Federal Claims] complaint satisfied this exception," but that "Palantir USG's 43-day delay in filing suit at the COFC after its GAO protest was denied on May 18, 2016, does not meet the stringent requirements of CGI. This delay is an order of magnitude greater than the three business days condoned in CGI." Defendant argues that a longer delay is "also inconsistent with common practice, as reflected by the statutory and regulatory time limits for filing protests at the GAO, 31 U.S.C. § 3553(d)(4) (10 days to invoke the mandatory stay); 4 C.F.R. § 21.2(a)(2) (10 days to file after the basis of the protest is known)." (footnote omitted). Instead, the defendant believes the standard it takes from Rex Service Corp. v. United States, 448 F.3d 1305 (Fed. Cir. 2006), is more appropriate.

In drawing a contrast with the protestor in CGI, the Federal Circuit described the procedural history in Rex Service as follows:

> Rex initially filed a pre-award protest with the agency. The agency denied its protest, and Rex, having not submitted a bid, did not pursue the matter further. The agency subsequently awarded the contract to another party and—two months after the award and three months after the agency denied its initial protest—Rex filed a post-award protest in the Court of Federal

---

[12] Before the United States Court of Federal Claims, CGI argued that the agency "violated the Federal Acquisition Streamlining Act and FAR 12.301, 12.302, and 10.002 by including payment terms in the RFQs that are inconsistent with customary commercial practice without first conducting market research or obtaining a waiver." CGI Fed. Inc. v. United States, 118 Fed. Cl. at 351.

Claims, raising issues entirely different from those raised in its agency protest. *Id.* We held that *Rex* was not a prospective bidder because it "could have bid, but chose not to."  We noted that in Rex's case, its pre-award agency protest was "not relevant" to determining its prospective bidder status.  We again noted that "'the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends.'"  We held that "In the end, Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims."

CGI Fed. Inc. v. United States, 779 F.3d at 1349 (citations omitted).  The Federal Circuit continued:

> In *Rex,* the protestor waited nearly three months after the agency denied its initial protest before filing the protest at issue and, in the interim, the agency awarded the contract to another bidder. *Rex*, 448 F.3d at 1307. Here, CGI filed its Court of Federal Claims protest within three business days of receiving its dismissal from the GAO and before CMS had awarded the contract. CGI, having secured prospective bidder status by filing its timely GAO protest did not lose it in the three business days it took to file in the Court of Federal Claims.  We acknowledge that *Rex* explained that the timely filed agency protest was "not relevant to Rex's status" as a prospective bidder at the time that it filed its Court of Federal Claims protest. This, we conclude, is because Rex failed to continue to pursue its rights in a diligent fashion, and thus ceased to be a prospective bidder. Rex's agency denial was met with inaction. That inaction persisted for months, and during that time the government awarded the contract. By the time Rex filed its Court of Federal Claims protest, its agency protest was no longer relevant.

CGI Fed. Inc. v. United States, 779 F.3d at 1350-51 (footnotes omitted).

Rex Service, however, does not offer a parallel to the facts of the protest currently under review by this court.  First and foremost, the protestor in Rex Service delayed more than "two months after the award and three months after the agency denied its initial protest" before filing a protest in this court. CGI Fed. Inc. v. United States, 779 F.3d at 1349 (citing Rex Serv. Corp. v. United States, 448 F.3d at 1307).  As noted by the Federal Circuit in CGI, the protest in Rex Service raised "issues entirely different from those raised in its agency protest." Id. Furthermore, the protestor in Rex Service did not file a GAO protest, and the protestor filed a protest in the Court of Federal Claims after the time when the government awarded the contract at issue in the protest. See id. Notably, Palantir USG filed a timely protest with GAO. In the GAO protest, and in the protest before this court, Palantir USG alleged substantially similar issues. Moreover, the Army in the protest currently under review has not yet made an award under the solicitation, whereas the agency in Rex Service made an award in between the time Rex Service's agency protest was denied and the protest was filed at the Court of Federal Claims. A pre-award protest is in a different posture than a post award protest, as a post award protest will have completed evaluations of the proposals and an award will have been made by the agency.

The Federal Circuit in <u>CGI</u> indicated in a footnote that "[a] longer delay than necessary may be a factor in the Court of Federal Claims declining to exercise jurisdiction. For example, 28 U.S.C. § 1491(b)(3) states that '[i]n exercising jurisdiction under this subsection, the courts shall give due regard to . . . the need for expeditious resolution of the action.'" <u>CGI Fed. Inc. v. United States</u>, 779 F.3d at 1351 n.4 (quoting 28 U.S.C. § 1491(b)(3)). In <u>CGI</u>, the Federal Circuit, however, did not provide specific guidance as to what would, or would not be an acceptable time period, except that the Federal Circuit found the three business day delay in coming to this court in <u>CGI</u> did not cause the protestor to lose its perspective bidder status.

Protestors argue that "*CGI* established no deadline for when a complaint in this Court must be filed following a timely GAO protest and the GAO's denial of a protest. Nor would there have been any statutory or regulatory basis for establishing such a deadline as the 'cut-off' for either being a prospective bidder or not being a prospective bidder." Protestors continue, "Palantir[13] did not wait 'three months' but instead notified the Court and the Government of its intent to file suit in this Court twenty-nine days after the GAO denied its protest; and Palantir's protest unquestionably remains 'relevant.'"[14]

Although the government in their briefs cites to the 10 day requirement for the GAO filings, specifically the 10 day requirement to invoke the mandatory stay at 31 U.S.C. § 3553(d)(4) (2012) and the 10 day requirement to file a protest at the GAO once the basis of a protest is known at 4 C.F.R. § 21.2(a)(2)(2016), at the oral argument, defendant's counsel more emphatically argued, essentially, that any time more than 10 days is not permitted and standing should not be found.[15] The court notes that the GAO deadlines are statutory ones promulgated by Congress in the United States Code and included in the Code of Federal Regulations regarding the proper timeframes for GAO filings. No such rigid timeframe has been established for protests in this court to circumscribe this

---

[13] As noted above, protestors use the term "Palantir" to refer to Palantir Technologies and Palantir USG collectively and protestors typically combined their arguments in the response to the motion to dismiss for both entities, and, therefore, mostly only referred generally to "Palantir." Although this portion of the opinion addresses only Palantir USG, the court has left protestors' quotes unchanged when the quote refers simply to "Palantir."

[14] At oral argument, protestors' counsel noted that protestors changed counsel after the GAO protest, which contributed to the amount of time it took to decide to file suit in this court.  At the argument, protestors' counsel stressed that he believed protestors "should be entitled to hire new counsel and did and we had to learn the record and refine the theories, which we think we did in a way that was consistent, but clearer and broken out into its discrete portions." Although not dispositive to resolve whether Palantir USG meets the requirements identified by the Federal Circuit in <u>CGI</u>, the court accepts that some of the delay was due to protestors' new counsel becoming familiar with the facts of the case, and drafting a complaint appropriate for this court.

[15] At the oral argument, defendant's counsel stated, "[w]e think the Court should look to the ten business days, as I said."

court's jurisdiction. Instead, Congress has allowed the court more discretion when considering the appropriate time frame for a protest, as 28 U.S.C. § 1491(b)(3) contemplates that the court "give due regard" to "the need for expeditious resolution of the action." Id. There is no magic number of days. Bid protests should be addressed individually, given the factual circumstances presented, recognizing, of course, the urgent need for resolution of bid protest cases.

In the protest currently before this court, the protestors state that 29 days passed from the GAO decision until protestors "notified the Court and the Government of its intent to file suit in this Court," in accordance with RCFC, Appendix C, ¶ 2 (2016).  In addition, 43 days passed from the issuance of the GAO decision until protestors formally filed suit in this court. Although the court believes the distinction between the 29 days when protestors allege the government and the court were notified, and the 43 days after the GAO decision, when the protest was filed, is not determinative to decide if protestors fall within the jurisdictional framework established by CGI, the court agrees that 43 days is the proper calculation date for the court to use. The pre-filing notice that protestors refer to does nothing more than make the court and the United States Department of Justice aware of a potential protest. It does not indicate with any degree of certainty that a protest will be filed. In fact, there are a significant number of pre-filing notices submitted to the court that do not mature into actual protests filed in the United States Court of Federal Claims. As Appendix C to the Rules of the United States Court of Federal Claims explains:

> The pre-filing notice is intended to permit the Department of Justice to assign an attorney to the case who can address relevant issues on a timely basis and to permit the court to ensure the availability of appropriate court resources. Failure to provide pre-filing notification will not preclude the filing of the case but is likely to delay the initial processing of the case, including the scheduling of the initial status conference.

RCFC, Appendix C, ¶ 2. As indicated in Appendix C, failure to file the notice does not materially impact the bid protest once filed at the court. Moreover, after a pre-filing notice is filed, not only is a potential protestor not obligated to subsequently file a protest, the notice does not impact any potential statute of limitations. Therefore, the appropriate date to calculate is from the time protestors actually filed their pre-award bid protest in this court, i.e., 43 days after the GAO decision was issued.

In the case of Palantir USG, and applying the specific facts and circumstances of Palantir USG's situation, the court concludes that the 43 days delay does not deprive Palantir USG of its status as a perspective bidder. During the delay the Army did not issue a contract award pursuant to the solicitation. Although the Army, as indicated by defendant's counsel at oral argument, may have taken steps toward award by undertaking evaluations or conducting discussions, the posture of the protest remains a pre-award protest.  Although not dispositive, in CGI the Federal Circuit not only focused on the delay in seeking relief in this court, but also on whether the government had issued a contract award. As the Federal Circuit in CGI indicated when comparing the CGI protestor to the protestor in Rex Service, "Rex failed to continue to pursue its rights in a

diligent fashion, and thus ceased to be a prospective bidder. Rex's agency denial was met with inaction. That inaction persisted for months, and during that time the government awarded the contract. By the time Rex filed its Court of Federal Claims protest, its agency protest was no longer relevant." CGI Fed. Inc. v. United States, 779 F.3d at 1351 (citing Rex Serv. Corp. v. United States, 448 F.3d at 1307). Also, when citing to Digitalis Education Solutions, Inc. v. United States, the Federal Circuit in CGI "held that a protestor that failed to submit the required statement of capability to the agency in the allotted time period and filed its Court of Federal Claims protest more than two months after the contract was awarded was not a prospective bidder." CGI Fed. Inc. v. United States, 779 F.3d at 1349 (citing Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d at 1383-86). In both Rex Service and Digitalis, delays of "months" combined with the agency awarding a contract changed the protestor's status as a prospective bidder. CGI Fed. Inc. v. United States, 779 F.3d at 1349, 1351. As described above, Palantir USG's delay was less than two months and the protest was filed in this court before a contract was awarded. Based on the factual circumstances presented, the court finds that Palantir USG has not lost its status as a prospective bidder.[16]

Separate from the CGI framework, defendant suggests Digitalis Education Solutions, Inc. v. United States, is a proper comparison. In Digitalis, the Federal Circuit found that the protestor did not have standing to file suit in this court. Defendant contends that as in Digitalis, "Palantir USG not only failed to submit a proposal before the closing date, *i.e.,* February 16, 2016, Palantir USG failed to respond fully to the Government's Request for Information No.2. Such failure further demonstrates that Palantir USG is not a 'prospective bidder' and does not have the requisite economic interest to establish standing." The protestors respond that Palantir USG "had *already provided* the Army with information about its prior Government contracts. There was no reason to do so again." (emphasis in original; internal citations omitted). The significant difference between Palantir USG and the protestor in Digitalis, is that Digitalis involved a sole-source procurement and not an open procurement like the above captioned protest. As explained by the Federal Circuit in Digitalis:

> In a sole-source award such as this one, the notice of intent issued by the government is analogous to a request for a proposal. Interested parties are invited to submit statements of capability in order to convince the government that it should hold a full competition for the contract rather than sole-source the contract to the proposed contractor. We therefore hold that in order to be an actual or prospective bidder, a party must submit a statement of capability during the prescribed period. Failure to do so also means that a party does not have the requisite direct economic interest because it cannot have a "substantial chance" of convincing the government

---

[16] The court does not mean to suggest that there is no time limit on how much time a protestor can extend the time between a GAO decision and filing a protest in this court. The circumstances presented must be reasonable and the time between the GAO decision and the filing in the United States Court of Federal Claims must not be significantly attenuated.

to hold a formal competition and subsequently bid on the contract.

Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d at 1385. The Federal Circuit also indicated that "[t]he notice stated that if any party challenged the sole-source contract to Science First, then it should file a statement no later than Wednesday, September 22, 2010, detailing its capability to fulfill the order." Id. at 1383. The protestor in Digitalis did not file a capability statement or otherwise protest the sole-source award, and, therefore, the Federal Circuit determined Digitalis did not have standing to protest the sole-source contract award at issue. See id. at 1383, 1385.

As noted by protestors, for the solicitation at issue here, "the Army set no deadline for offerors of commercial items to submit their objections to the Army's decision to issue a Solicitation for a developmental project, and therefore Palantir cannot be accused of missing such a deadline." Moreover, as protestors note: "The RFI did not establish a deadline for objecting to the Army's plan to issue a solicitation for a developmental project. Instead, the RFI was issued pursuant to FAR 15.201(e), which applies not when an agency is seeking to award a contract but rather is seeking information 'for planning purposes.'" Furthermore, the August 13, 2014 Request for Information definitively stated that "[t]his RFI is being conducted solely for information and planning purposes and does not constitute a solicitation."[17] Protestors correctly observe that the August 13, 2014 Request for Information "further stated that '[p]articipation in response to this RFI will not preclude any vendor from responding to future acquisitions, either individually or as part of a team.'" This stands in contrast to the language of the notice in Digitalis which required any offeror challenging the sole-source to submit a statement by a specific date.

Protestors also believe that the Army was on notice of Palantir USG's issues with the solicitation from Palantir USG's response to the first Request for Information because "Palantir's response to the first RFI had listed its prior government contracts, and specifically identified its contracts with the Marine Corps and other Department of Defense agencies as part of a comprehensive and detailed demonstration that commercial items were available on a firm-fixed-price basis to meet the Army's needs."[18] The court finds the sole-source notice issue in Digitalis to be sufficiently different from the above captioned protest as to not be a useful comparison. Another difference between this protest and the one in Digitalis is the procedural history.  As noted by the Federal

---

[17] The August 13, 2014 Request for Information also stated: "This is not a request for proposal, request for quotation, or an invitation for bid, nor does its issuance obligate or restrict the Government to any particular acquisition approach. This RFI does not obligate the Government to issue a solicitation."

[18] Protestors also claim it is misleading for defendant to suggest that Palantir USG's responses to the Requests for Information left the Army in the dark about Palantir USG's views of the solicitation. Protestors claim that "the RFI responses were just one small part of Palantir's persistent efforts throughout this process to inform the Government of the capabilities of its commercial product, and of the inherently flawed nature of the Government's developmental approach."

Circuit in CGI, "in *Digitalis,* we held that a protestor that failed to submit the required statement of capability to the agency in the allotted time period and filed its Court of Federal Claims protest more than two months after the contract was awarded was not a prospective bidder." CGI Fed. Inc. v. United States, 779 F.3d at 1349. As discussed above regarding Rex Service, in this protest, the agency has not yet made an award. In sum, once again, Palantir USG has not lost its prospective bidder status in this court.

The other requirement Palantir USG must demonstrate to prevail on the issue of standing is that Palantir USG has a direct economic interest.  As noted in CGI:

> To have standing, CGI must also have a direct economic interest affected by the award of the contract. *Digitalis*, 664 F.3d at 1384. CGI can satisfy this requirement by showing that it suffered "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1361–62 (Fed. Cir. 2009).

CGI Fed. Inc. v. United States, 779 F.3d at 1351.  As explained by the Federal Circuit in Weeks Marine:

> We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder/offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. *See, e.g., Statistica,* 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis.

Weeks Marine, Inc. v. United States, 575 F.3d at 1361; see also Orion Tech., Inc. v. United States, 704 F.3d at 1348. Protestors claim that "[t]here is no question that Palantir has demonstrated a non-trivial competitive injury, and the Government does not argue otherwise," and argues that "the defects in the Solicitation have deprived Palantir of the ability to compete to supply commercial items to fulfill the requirements of the DCGS-A program; further, if the contract is awarded, it will be permanently deprived of that opportunity."

At the oral argument, defendant argued that the non-trivial competitive injury standard is not the correct one to use in this case. Although acknowledging that the Weeks Marine standard is the standard typically applied to pre-award protests, defendant insisted before the court that the substantial chance standard is the appropriate one.[19] In

---

[19] At the oral argument, defendant's counsel stated regarding application of

the substantial chance test or the nontrivial competitive interest test, what

its briefs defendant was more measured:

> The *Weeks Marine* "non-trivial competitive injury" standard, however, does not apply to every pre-award protest. In *Orion,* 704 F.3d at 1349, the Federal Circuit applied the "substantial chance" prejudice standard to a protest challenging the rejection of a proposal prior to the issuance of a contract award. Although the protest was pre-award, the Federal Circuit explained that, unlike in *Weeks Marine,* "an adequate factual predicate to ascertain [prejudice] under the traditional 'substantial chance' standard [sic] existed. *Id.* In other words, because the record showed that the agency had evaluated the protester's proposal against the solicitation's evaluation criteria, the Court was able to ascertain whether the agency's decision to exclude the protester harmed it.

The court notes, however, there are numerous differences between the protestor in <u>Orion</u> and Palantir USG. As noted by the Federal Circuit in <u>Orion</u>:

> Orion is not challenging the terms of the solicitation, as was the case in *Weeks Marine*; it is challenging the Army's application of those solicitation criteria to Orion. The Army evaluated Orion's bid for compliance with the terms of the solicitation and then gave detailed reasons for rejecting Orion's proposal. In addition, Orion's bid was within the competitive range later established by the Army after Orion's exclusion but before the Army's initial response to Orion's first GAO protest. Given the circumstances, there is an adequate factual predicate to ascertain under the traditional "substantial chance" standard whether Orion was prejudiced by the Army's decision to exclude its initial proposal.

<u>Orion Tech., Inc. v. United States</u>, 704 F.3d at 1349. The Army did not evaluate a proposal from Palantir USG because one was not submitted. Therefore, unlike in <u>Orion</u>, the Army could not evaluate Palantir USG's bid for compliance with the terms of the solicitation or give detailed reasons for rejecting the proposal.  Nor in this protest has the Army revealed the competitive range for the procurement.   In this protest, Palantir USG is not, as in <u>Orion</u>, challenging the Army's application of solicitation criteria to Palantir USG. The court

---

> the Court looks to is the factual circumstances as stated by the Federal Circuit in the Orion case," and argued that "this is a case where it's not just pre-award, it's pre-award, but it's post bid. So, in these circumstances where it's post bid, other offerors have made -- other offerors have tendered their offers. In this type of situation, the Court can look at the facts and can come to a decision on whether there's any substantial chance that they would have been awarded the contract.

The court notes that even if the posture of this protest is after bids were submitted, or as indicated by the government, even after steps towards evaluations may have taken place, there is no evidence in the record that analysis of the proposals that were submitted has been completed.

believes the current challenge is much closer to the <u>Weeks Marine</u> line of cases, a challenge to the terms of the solicitation itself, and not like in <u>Orion</u>, the application of solicitation criteria to Orion. Under the less stringent non-trivial competitive injury standard, the court agrees with protestors that if there are errors in the solicitation and solicitation development process, as protestors have argued on the merits of the case, those defects would have the effect of depriving Palantir USG of the ability to compete to supply commercial items to fulfill the requirements of the DCGS-A program. See <u>BINL, Inc. v. United States</u>, 106 Fed. Cl. 26, 38 (2012).

Furthermore, protestors in their response to the motion to dismiss argued that "while not required to satisfy the 'direct economic interest' standard, Palantir also has amply alleged its capability to supply the Army's requirements through the Palantir Gotham Platform, including by pointing to the contracts that it has entered into with other agencies within the Department of Defense." As alleged in the complaint, and argued to this court, "[s]ince 2010, Palantir has successfully provided the Palantir Gotham Platform to numerous customers, including federal and local law enforcement agencies, the United States Marine Corps, the United States Special Operations Command ('SOCOM'), the Defense Intelligence Agency, and numerous other government agencies (as well as numerous private sector companies)."[20] If given the opportunity to bid on a revised solicitation for a commercial item, it appears Palantir USG would have a substantial chance of a contract award. See <u>Todd Constr., L.P. v. United States</u>, 656 F.3d at 1315. Palantir USG, therefore, has demonstrated standing to pursue the filed protest on the merits.

---

[20] Moreover the Administrative Record contains a "DCGS-A Inc 2 Information Paper Inc 2 Key Objectives and Approach," which encouraged the agency to "[c]ompete a Full and Openly Competed Contract for the key objectives of DCGS-A Increment 2 (Data Enterprise Modernization and an easier to use visualization framework)" and indicated in part:

> Industry to deliver the infrastructure for document / entity information to ingest, process, and organize all of the textual data available to DCGS-A to displace the Entity (TED) and Document (MSG) - infrastructure that interoperates with the Geospatial and other Intelligence data-specific data sources using standards such as Open Geospatial Consortium (OGC), Motion Imagery Standards Profile (MISP), etc. This infrastructure could be a commercial stand-alone solution (Palantir, IBM) or it could be a collection of capabilities (RDMS + Hadoop +…) as long as the infrastructure has the 'ilities', an open architecture, and the ability to organize the data and mature touch-points to the data.

This indicates, at a minimum, if the structure of the solicitation was changed to one seeking a commercial item, Palantir USG would have a substantial chance to be competitive and receive a contract.

Failing to the convince the court of its prospective bidder and economic interest arguments regarding Palantir USG, defendant has also argued that, "[a]lternatively, application of the waiver doctrine recognized in *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308 (Fed. Cir. 2007), warrants dismissal of plaintiffs' complaint," because the "alleged defects in the solicitation are patent and plaintiffs could have brought suit in the COFC before the close of the bidding process, rather than attempting to take advantage of the Government and other bidders by delaying the filing of their suit." Protestors' contend that "the Government misstates the holding of *Blue & Gold.* That decision nowhere requires the filing of a lawsuit in the Court of Federal Claims to avoid a finding of waiver." Protestors also argue "[b]ecause Palantir objected to the Army's decision by filing a GAO protest prior to the close of bidding, the waiver doctrine does not apply here. The Government cites no case holding otherwise."

As noted above, although Palantir USG submitted responses to the Army's Requests for Information, and had raised the availability of a commercially available alternative to the agency, Palantir USG did not submit a proposal in response to the research and development solicitation. Instead, the same day that the opportunity to submit a proposal in response to the solicitation closed, February 16, 2016, but prior to closing, Palantir USG filed a timely protest at the GAO.

In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, the United States Court of Appeals for the Federal Circuit addressed if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. In Blue & Gold Fleet, L.P. v. United States, the protestor challenged the National Park Service's award of a contract to Hornblower Yachts, Inc. (Hornblower) for ferry services to Alcatraz Island. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1310-11. The protestor argued that Hornblower's proposal did not include employee wage and benefits information required by the Service Contract Act, thus, making the Park Service's evaluation of the cost of Hornblower's proposal flawed. See id. at 1312. The Federal Circuit acknowledged that "[b]y statute, the Park Service must 'evaluate . . . proposals and make an award based solely on the factors specified in the solicitation.'" Id. at 1313 (quoting 10 U.S.C. § 2305(b)(1)). Moreover, in Blue & Gold, the Federal Circuit acknowledged that "[i]n this case, it is true that the decision not to apply the Service Contract Act to the contract may have influenced the evaluation of the proposals; however, the Park Service made this decision during the solicitation, not evaluation, phase of the bidding process." Id. The Federal Circuit noted that the solicitation "did not include any requirement that the bidders consider the Service Contract Act," id., and that the protestor had not raised any objection to the exclusion of Service Contract Act requirements prior to the submission of proposals. Therefore, the Federal Circuit found that the protestor was challenging the terms of the solicitation, not the agency's evaluation of Hornblower's proposal. See id.

The Federal Circuit also noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the Park Service had selected Hornblower for contract award. See id. at 1311. In considering if the protestor had waited too long to

challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Draken Int'l, Inc. v. United States, 120 Fed. Cl. 383, 393 (2015). In Blue & Gold, the Federal Circuit held:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Per Aarsleff A/S v. United States, No. 2015-5111, 2016 WL 3869790, at *6 (Fed. Cir. June 23, 2016); Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); Universal Marine Co., K.S.C. v. United States, 120 Fed. Cl. 240, 248–49 (2015); Northeast Constr., Inc. v. United States, 119 Fed. Cl. 596, 609 (2015); Innovative Mgmt. Concepts, Inc. v. United States, 119 Fed. Cl. 240, 245 (2014); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in *Blue and Gold Fleet* thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original).

The Federal Circuit also explained in Blue & Gold:

> "It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)); see also Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014).

In its reply brief, defendant indicates that "Plantiffs [sic] suggest that the *Blue & Gold* waiver doctrine ought not apply in a pre-award bid protect [sic]." Although, not so explicitly stated in protestors' response to the motion to dismiss, the Federal Circuit has repeatedly determined that waiver can apply to pre-award protests as well as post-award protests. The Federal Circuit in <u>COMINT Systems Corp. v. United States</u>, 700 F.3d 1377, extended the logic of <u>Blue & Gold</u> to all pre-award situations, as follows:

> In *Blue & Gold Fleet, L.P. v. United States*, this court held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." [*Blue & Gold Fleet, L.P. v. United States*,] 492 F.3d 1308, 1315 (Fed. Cir. 2007). Comint points out that *Blue & Gold's* holding does not explicitly apply to this case since Comint had no opportunity to challenge the solicitation before "the close of the bidding process," Amendment 5 having been adopted after the bidding process closed. Amendment 5 was, however, adopted before the award, and we think the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so.
>
> There is no question that Comint could have challenged the solicitation before the award. The Federal Acquisition Regulations require that agency contracting officers "consider all protests . . . *whether protests are submitted before or after award*." 48 C.F.R. § 33.102(a) (emphasis added). If efforts to obtain relief from the contracting officer fail, the Tucker Act specifically authorizes pre-award challenges. The statute gives the Claims Court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency," and further provides that the Claims Court has jurisdiction "without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1).
>
> The same policy underlying *Blue & Gold* supports its extension to all pre-award situations. In *Blue & Gold*, we explained:
>
>> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent.... If its [ ] proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

> [*Blue & Gold Fleet, L.P. v. United States,*] 492 F.3d at 1314.
>
> To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract.

COMINT Sys. Corp. v. United States, 700 F.3d at 1382 (footnote omitted; alteration in original); see also Per Aarsleff A/S v. United States, 2016 WL 3869790, at *7; Comm'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 261-62 (2014) ("[P]arties who have the opportunity to object to the terms of a solicitation containing patent errors or ambiguities and fail to do in a timely fashion waive their ability to subsequently raise the same objections. . . .  The *Blue & Gold* waiver rule as extended by COMINT is simple: if there is a patent ambiguity or error in the solicitation, a plaintiff must seek redress in court prior to award.").

> The Federal Circuit further explained in Bannum, Inc. v. United States:
>
> Our waiver rule implements Congress's directive in the Administrative Dispute Resolution Act (ADRA) of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874, that courts "shall give due regard to . . . the need for expeditious resolution" of protest claims. 28 U.S.C. § 1491(b)(3); see Blue & Gold, 492 F.3d at 1313. A waiver rule implements this statutory mandate by reducing the need for the "inefficient and costly" process of agency rebidding "after offerors and the agency ha[ve] expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation." *Blue & Gold*, 492 F.3d at 1314 (internal quotation marks and citation omitted). In this context, clarity is not just readily achievable but important. Requiring that the prescribed formal routes for protest be followed (to avoid waiver) reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges.

Bannum, Inc. v. United States, 779 F.3d 1376, 1380 (Fed. Cir. 2015).  The Federal Circuit also emphasized that:

> The solicitations at issue and the governing regulations put Bannum on notice of the formal requirements for filing a "protest" that would trigger an agency obligation of response and prompt resolution. Bannum did not comply with those requirements; nor did it pursue other available means of formal protest (*e.g.,* to the GAO or the Court of Federal Claims) until after the awards. In these circumstances, it waived its solicitation challenges.

25

Id. Therefore, in the years since the Blue & Gold decision, the Federal Circuit has expanded the waiver rule. Recently, in Phoenix Management, Inc. v. United States, in finding a protestor waived its objections to the solicitation, a Judge of this court noted that "the purported solicitation defects identified by plaintiff existed when the Air Force issued the solicitation on February 18, 2015. As a consequence, plaintiff had ample opportunity to challenge these purported defects prior to the April 1, 2015 proposal submission deadline, either through an agency-level protest, by lodging a protest at the GAO, or by filing a protest in this court." Phoenix Mgmt, Inc. v. United States, 125 Fed. Cl. at 182.

As protestors correctly states: "*Blue & Gold, COMINT, Bannum,* and *Per Aarsleff A/S v. United States* all involved bid protests where the offerors did not file *any* formal protests during the bidding period, and instead opted to file [28 U.S.C.] § 1491(b) actions *after* award of the contracts." (emphasis in original). In CGI, discussed extensively above, the Federal Circuit drew distinctions between protestor CGI and other, unsuccessful, protestors who had filed suit in the United States Court of Federal Claims.  The Federal Circuit stated:

> The same cannot be said of CGI, which diligently and continuously pursued its rights in the GAO and then, immediately upon dismissal by the GAO, in the Court of Federal Claims. Neither party disputes that CGI qualified as a prospective bidder on the day that it filed its GAO protest. Thus, it "achieve[d] prospective bidderhood" at that time. *MCI*, 878 F.2d at 365. The fact that—as *MCI, Federal Data,* and *Digitalis* all make clear—CGI's opportunity to *qualify* as a prospective bidder ends when the solicitation period ends does not doom CGI because it had already achieved prospective bidder status with its timely GAO protest. It seems equally clear that CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was continuously pursuing its challenge to the payment terms in the 2014 RFQs.

CGI Fed. Inc. v. United States, 779 F.3d at 1349-50 (emphasis in original; footnotes omitted). Although quoted above, this court notes that in CGI the Federal Circuit made clear that:

> CGI was a prospective bidder when it promptly initiated and diligently pressed its protest in the GAO forum, which Congress has encouraged protestors to use before suing in court. Unsuccessful in the GAO, it immediately filed for relief in court. We do not think that Congress meant for a protestor in CGI's position to lose its entitlement to sue just because delays engendered by the GAO adjudicatory process pushed completion past the closing date for bid submissions. Concluding, as we do, that CGI filed a protest prior to the close of bidding and thereby established its prospective bidder status, and that CGI thereafter diligently pursued its rights, CGI has prospective bidder status to pursue its Court of Federal Claims protest.

Id. at 1351.

As noted above, protestors took issue with defendant's characterization of the Blue & Gold waiver line of case that require the filing of a lawsuit specifically in the United States Court of Federal Claims to avoid a finding of waiver, and argue "[b]ecause Palantir objected to the Army's decision by filing a GAO protest prior to the close of bidding, the waiver doctrine does not apply here. The Government cites no case holding otherwise." Indeed, defendant simply states: "Plaintiffs, by failing to file their objections to the solicitation in a bid protest suit in the Court of Federal Claims before the close of the bidding process, waived their objections to the terms of the solicitation." As indicated by the Federal Circuit in CGI and in this court in Phoenix Management, however, the timely filing of a GAO protest is valid way to preserve objections, and simply because Palantir USG initially went to the GAO instead of this court, does not mean that protestor Palantir USG has waived its objections to the solicitation.[21]

As stated by the GAO, "[t]he closing date for the submission of quotations was February 16, and this [GAO] protest was filed on that date, prior to closing." Palantir USG, Inc., 2016 WL 3035029, at *2. Moreover, the same is conceded in defendant's motion to dismiss: "The closing date for the submission of quotations was February 16, 2016, and Palantir USG, Inc. filed its GAO protest on that date before the solicitation's closing time. . . ." Therefore, because Palantir USG timely filed a protest at the GAO before the close of submissions, Palantir USG did not waive the ability to challenge the solicitation in this court.[22] As determined above, Palantir USG also has established prospective bidder status and a direct economic interest, Palantir USG did not lose its status as a result of the 43 day delay in filing the protest in this court after the GAO decision was issued, and has not waived is objections to the solicitation by filing its protest in this court after Palantir USG filed a protest at the GAO.

Finally, regarding Palantir USG, defendant argues that "Palantir failed to make the allegations and arguments in Count II of the complaint before the GAO. Having failed to raise the allegations and arguments in Count II before the GAO, Palantir USG could not possibly come within the exception recognized in the CGI decision even if it had filed suit

---

[21] Furthermore, in Bannum, the Federal Circuit noted the protestor waived any solicitation challenges when it "did not comply with those requirements; nor did it pursue other available means of formal protest (e.g., to the GAO or the Court of Federal Claims) until after the awards. In these circumstances, it waived its solicitation challenges." Bannum, Inc. v. United States, 779 F.3d at 1380. Bannum, therefore, made it explicit that pursuing a protest at the GAO is a legitimate way to prevent waiver in the Court of Federal Claims.

[22] Defendant also cites to decisions such as VION Corp. v. United States, 122 Fed. Cl. 559 (2015), which applied the Blue & Gold waiver standard to a post-award bid protest in which the protestor challenged an agency's proof of concept plan. A case such as VION does not address whether the protestor forestalled waiver by timely filing a GAO protest, and, therefore, is not helpful to the court's determination.

in the COFC three days after GAO's denial of its protest."[23] Protestors respond that "[t]here is no case law or legal principle to support that. . . ." The court agrees with protestors' counsel that the no case has been identified that would bar Palantir USG's complaint in this court because the allegations in count two were not brought before the GAO. Protestors also argue, "moreover, the claims and factual allegations the Government seeks to bar were in fact made before the GAO." Furthermore, at oral argument, counsel for the protestors stated that

> there have been extensive representations to you that we did not make that argument, that Count 2 argument, that we can do it all on a commercial item basis. You've been told that we did not make that argument before the GAO. That's not accurate, Your Honor. It is true, perhaps, that the focus of our argument was what our data management platform could do and they should have defined their requirements in what could be called phases or really just different contracts.

As noted above, count two of the complaint filed in this court alleges that the Army violated 10 U.S.C. § 2377 and 48 C.F.R §§ 10.002 and 11.002 by refusing to solicit a commercial item for the entirety of DCGS-A2. Protestors' counsel also pointed to the post-hearing comments submitted by the Army during the GAO protest, in which the Army stated:

> The Army raises the issue of Palantir not being an interested party at this time because in its cross examination of [redacted], Protester counsel drew the GAO's attention to the RFI response given by Palantir which he suggested by his questions meant that Palantir could not only provide all the capabilities of the requirement, but could also do so at a much less expensive cost than its website information had indicated. Palantir has therefore taken the position that it could perform the entire contract using its commercial software at a reasonable cost, and yet, it failed to submit a proposal.

(internal citations omitted). Although not clearly identified by Palantir USG's previous counsel in its GAO complaint, the court agrees with protestors that the issue of whether or not Palantir USG could perform the entirety of the DCGS-A2 project on a commercial basis was before the GAO and the Army had the opportunity to address the issue.

The court notes that separate from the allegations regarding count two, defendant contends, regarding allegations of bad faith:

> Palantir USG stated at the most that its assertions suggest bad faith. Such general statements, one of which is only in a footnote, were insufficient to

---

[23] Defendant also argues, "[f]or the same reasons, all of the embellishments and new allegations that Palantir USG seeks to raise now, but did not raise at GAO, are untimely and beyond the Court's jurisdiction."

bring the claim of bad faith to the GAO as a protest ground for decision. Palantir USG did not raise the bad faith claims in its court complaint to any degree that would have allowed the GAO to address them.

At oral argument, counsel for the protestors reiterated, "we don't think there's any legal basis for hamstringing us to the arguments made to the GAO." Moreover, although defendant's counsel pointed out that the words "bad faith" only appear in a footnote in Palantir USG's GAO complaint,[24] the GAO complaint does identify some of the facts that give rise to the bad faith allegations now before this court. Palantir USG's GAO complaint stated:

> Even more troubling was a series of events related to an ATEC [United States Army Test and Evaluation Command] assessment of Palantir conducted in theater in early 2012. An initial report of that assessment, issued on April 25, 2012, was revised at the request of Army G-2 and reissued on May 25, 2012. The revisions to the ATEC assessment suppressed favorable comments about Palantir and minimized criticisms of DCGS-A Increment 1. "It appears . . . that a second version of the report was created," which deleted both favorable comments about Palantir and comments criticizing DCGS-A. Internal Army correspondence directed that the original report be formally rescinded and all copies destroyed. The Army then launched a formal investigation into the matter.

(internal citations omitted). Moreover, since the time the complaint was filed in this court, this court has held multiple hearings with the parties on issues related to supplementation of the Administrative Record and limited discovery, which the court has permitted, including regarding allegations of bad faith. Therefore, the record before this court will not be as limited as the Administrative Record before the GAO. The defendant's concerns about the absence of bad faith allegations at the GAO are misplaced.

In addition to challenging Palantir USG's standing, the defendant also separately challenges Palantir Technologies' standing. Defendant states that "Palantir Technologies, Inc. did not submit a proposal in response to the Army's solicitation, did not respond to

---

[24] The footnote in the GAO complaint stated:

> Unfortunately, the Army's failure in this regard [to not consider if commercial items were available to meet its needs] might be explained in part by its long-standing resistance to commercial solutions generally, and to Palantir specifically. As described above, there are suggestions that the Army rejected requests for Palantir from users in the field and manipulated testing results favorable to Palantir because of a misguided, self-interested, and inappropriate perception of Palantir as a "competitor" of DCGS-A. Such action on the Army's part suggests bad faith.

(internal citations omitted).

the Army's requests for information, and was not a party in the GAO protest." Defendant argues, "Palantir Technologies failed to respond to any of the Army's requests for information and cannot establish standing both because it is not a prospective bidder and does not have the requisite economic interest," Defendant, therefore, concludes, "[a]ccordingly, the Court should summarily dismiss Palantir Technologies, because it cannot demonstrate that it is a 'prospective bidder' or that it has the requisite 'economic interest;' therefore, it is not an 'interested party' under 28 U.S.C. § 1491(b)(1)." In response, protestors claim "PTI [Palantir Technologies] and PUSG [Palantir USG] are both prospective bidders, and PUSG acts as PTI's agent as well as on its own behalf." Protestors further claim that "PTI owns 100% of PUSG," and, citing to <u>Centex Corp. v. United States</u>, 395 F.3d 1283 (Fed. Cir.), <u>reh'g</u> <u>and</u> <u>reh'g</u> <u>denied</u> (Fed. Cir. 2005), claim that the United States Court of Appeals for the Federal Circuit has concluded it is unnecessary to "determine the standing of a parent corporation when the parent's wholly owned subsidiary has standing to bring suit."[25] Protestors argued, at oral argument, that "Palantir Tech acted through PUSG as its agent in making the protest at the GAO," but without a citation to why Palantir Technologies would be exempt from waiver, and noted that "the Government does not cite a single case supporting the proposition that both PTI and PUSG were required to submit protests with the GAO (or both required to sign the same protest), even though they seek to bid and perform the desired contract together as commonly owned Palantir entities."

It is not a point of disagreement that Palantir Technologies is the parent corporation of Palantir USG. Nor is it challenged that Palantir USG is a wholly owned subsidiary of Palantir Technologies.[26] As noted above, protestors believe this makes a standing inquiry into Palantir Technologies unnecessary. In <u>Centex</u>, the United States Court of Appeals for the Federal Circuit addressed whether the government had breached a contract with plaintiffs Centex Corporation and CTX Holding Company when Congress enacted tax legislation in 1993, referred to as the Guarini Amendment, Pub. L. No. 103-06, § 13224, 107 Stat. 312, 485-86 (1993). <u>See</u> <u>Centex Corp. v. United States</u>, 395 F.3d at 1287. The Federal Circuit noted that the government argued on appeal that Centex Corporation lacked standing to sue, and determined that:

It is unnecessary for us to decide whether Centex Corporation and the government entered into either an express or implied-in-fact contract, however, because the outcome of this case does not depend on the resolution of that question. That is because even if Centex Corporation

---

[25] The court notes that the issue regarding the standing of a parent of a wholly owned subsidiary is distinct from a recent bid protest decision of the undersigned. In <u>Universal Protection Service, LP v. United States</u>, 126 Fed. Cl. 173 (2016), the undersigned determined that protestor was "not the complete successor-in-interest to ABM Security Services' proposal, and, therefore, the court [could not] consider the merits of the protest." <u>Id.</u> at 195.

[26] Defendant states in the motion to dismiss, "[a]ccording to the complaint, Palantir Techologies, [sic] Inc. owns 100% of the stock of Palantir USG, Inc."

could not sue for breach of contract with the government, Centex Corporation's wholly owned subsidiary, CTX [Holding Company], was a party to the Assistance Agreement and is fully entitled to enforce its provisions and to be awarded damages for its breach.

Id. at 1291.

Turning to the government's specific standing arguments against CTX, the Centex court rejected the argument that CTX retained its status as a separate taxable entity and could not assert claims on behalf of the Centex Consolidated Group because:

While it is true that CTX retained its status as a separate taxable entity, CTX was nonetheless a member of the Centex Consolidated Group that consented to the filing of a consolidated tax return. As a consequence, it enjoyed the benefits and was subject to the liabilities flowing from the consolidation of the tax accounts of the various affiliated entities. *See Helvering v. Morgan's, Inc.*, 293 U.S. 121, 127, 55 S. Ct. 60, 79 L. Ed. 232 (1934). CTX was therefore in a position to benefit, through the reduction of the Consolidated Group's tax liability, from deductions that would reduce the Consolidated Group's taxable income. For that reason, CTX has a legal stake in the question whether the Consolidated Group was entitled to the tax benefits that were assertedly revoked by the Guarini amendment. We therefore reject the government's argument that neither plaintiff has standing to sue for breach of contract.

Centex Corp. v. United States, 395 F.3d at 1291. The Federal Circuit also rejected the claim that CTX was not damaged by the enactment of the Guarini amendment because it had no taxable income to shelter during the pertinent period, and because as a member of the Centex Consolidated Group, "CTX was eligible to share its tax benefits with the Group, and it was severally liable for the Group's tax liabilities." Id. Therefore, finding CTX had standing, the Federal Circuit did not further address Centex Corporation's standing. As noted above, this court found that Palantir USG has standing to proceed to the merits of the protest.  The court also notes that the facts and circumstances in Centex are quite different than those in the above captioned protest, most notably, that Centex was not a bid protest at all, but was a complicated government contract case with a tax liability issue. Moreover, the Federal Circuit was determining the standing issue on appeal and not at the trial court level. Therefore, it does not follow that this court should automatically apply the logic of not determining separate standing for the parent of a wholly-owned subsidiary in Centex to determine which entity between the parent and subsidiary has standing to bring a bid protest in this court.[27] Even if the court were to conclude that logic of Centex

---

[27] Defendant also raised a different issue that, even if the court were to apply the Centex rationale that it is unnecessary to decide Palantir Technologies' standing because "each named plaintiff must establish standing to remain in the case, and be entitled to a judgment. If the Court determines that Palantir USG possesses standing, but does not determine whether Palantir Technologies possesses standing, the judgment could only

should apply to bid protest cases, which it does not reach, Palantir Technologies would still have to demonstrate its claims are not waived. As noted by defendant, "[t]he question of waiver is distinct from whether a protestor has standing to bring a protest," such that even if Palantir Technologies was found to be an interested party with standing, as a prospective bidder with a direct economic interest, that determination is "an issue distinct from whether a protestor waived arguments." CGI Fed. Inc. v. United States, 779 F.3d at 1350 n.3 (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313).[28]

The court notes that it is uncontested that Palantir Technologies did not submit responses to the Army's Requests for Information, nor did Palantir Technologies submit a proposal in response to the Army's solicitation. Likewise, it is not contested that Palantir Technologies was not listed as a party to the GAO protest.  Palantir Technologies, like Palantir USG, believed the solicitation was flawed, indeed, both protestors in the complaint filed in this court allege that, as written, "[t]he Solicitation for DCGS-A2 makes it impossible for Palantir [referring to both Palantir Technologies and Palantir USG] to offer its Data Management Platform as a commercial or nondevelopmental item to satisfy the Army's requirements." Palantir Technologies, however, unlike Palantir USG, took no steps to place the Army on notice of the patent defects it believes are contained in the solicitation. Pursuant to the Blue & Gold Fleet line of cases, Palantir Technologies' arguments have been waived.  Therefore, Palantir Technologies is dismissed from this protest. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Per Aarsleff A/S v. United States, 2016 WL 3869790, at *7; COMINT Sys. Corp. v. United States, 700 F.3d at 1382; Comm'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. at 261-62.

## CONCLUSION

The timely protest filed at GAO does not cause Palantir USG's claims to become subject to waiver in this court. Moreover, although Palantir USG did not immediately file suit in this court after the GAO decision, as discussed above, the factual circumstances in the case of Palantir USG nevertheless fall permissibly within the framework set out by the Federal Circuit in the CGI case. Protestor Palantir USG, therefore, has standing to proceed to the merits of the above captioned protest. Defendant's motion to dismiss Palantir USG for lack of subject matter jurisdiction is **DENIED.**  Palantir Technologies, however, did not file a timely protest with the GAO, and, therefore, its claims are subject to waiver. Defendant's motion to dismiss Palantir Technologies for lack of subject matter

---

be entered in favor of Palantir USG, assuming the Court concludes both that Palantir USG has standing and prevails on the merits."

[28] Protestors also cite to Railway Labor Executives' Association v. United States, for the statement, "the Supreme Court has repeatedly held that if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." Ry. Lab. Executives' Ass'n v. United States, 987 F.2d 806, 810 (D.C. Cir.), reh'g denied (D.C. Cir. 1993). Like the Centex decision, Railway Labor is not a bid protest decision, and, therefore, does address waiver in the context of a bid protest. Unlike the Federal Circuit's decision in Centex, however, the Railway Labor decision by the D.C. Circuit is not binding on this court.

jurisdiction is **GRANTED.**

 **IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
 **Judge**